IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **RYAN PATRIC THOMAS,** | : | |
| Plaintiff, | : | |
| | : | |
| VS. | : | NO. 5:11-CV-94 (WLS) |
| | : | |
| **CURTIS BILLUE, DONALD WILLIAMS, CARTER KETCHUP, GEORGE BALL, MICHAEL McCORD, ALFRED WEEMS, and WILBERT HARTSFIELD,** | : | |
| | : | |
| | : | **Proceedings Under 42 U.S.C. § 1983** |
| Defendants. | : | **Before the U.S. Magistrate Judge** |

## RECOMMENDATION

Before the Court are Motions for Summary Judgment filed by Defendants Donald Williams (Doc. 78), George Ball (Doc. 79), Alfred Weems (Doc. 81), Curtis Billue (Doc. 83), Wilbert Hartsfield (Doc. 85), and Carter Ketchup (Doc. 86). Defendant Michael McCord has filed a Motion to Dismiss. Doc. 82. Because there are genuine issues of material fact related to Plaintiff's claims of excessive force under the Eighth Amendment against Defendants Ball, Billue, and Weems, it is hereby **RECOMMENDED** that the Motions for Summary Judgment of Defendants Ball, Billue, and Weems (Docs. 79, 83, and 81) be **DENIED**. In support of his claims against the remaining Defendants, Plaintiff has failed to demonstrate that there are genuine issues of material fact and Defendants have shown that they are entitled to judgment as a matter of law; therefore, it is **RECOMMENDED** that Summary Judgment be **GRANTED** as to Defendants Williams, Hartsfield, Ketchup, and McCord.[1]

---

[1] In light of the full record of evidence before the Court, it is recommended that McCord's Motion to Dismiss be considered as a Motion for Summary Judgment.

1

PROCEDURAL AND FACTUAL HISTORY

On March 10, 2011 Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 1983, alleging that the Defendants, officers at the Georgia Diagnostic and Classification Prison (GDCP) in Jackson, Georgia, violated his constitutional rights by using excessive force while removing him from his cell. The facts set forth below are construed in the light most favorable to Plaintiff, with all reasonable inferences drawn in support of Plaintiff's claims. Because the evidence submitted in this case includes a video recording of the incident, however, Plaintiff's testimony must be considered in light of the video evidence. See Scott v. Harris, 550 U.S. 372, 380-81 (2007).

**1.    Plaintiff's testimony**

The evidence shows that the Defendant officers were engaged to remove Plaintiff from his cell on February 6, 2010, after Plaintiff had activated the sprinkler system in his cell. At the time, Plaintiff was housed in the Special Management Unit at GDCP, a high security unit where inmates are kept essentially in solitary confinement. Plaintiff was serving a sentence for charges that included riot in a penal institution, escape, aggravated assault, and possession of a knife in the commission of a felony. Pl.'s Dep. 20 (Doc. 76-7). While incarcerated, Plaintiff had received a number of disciplinary reports for insubordination and failure to work, had been in at least one fight with a fellow inmate, and had struck a corrections officer during the course of a previous cell extraction. Id., 26-27.

The February 6 incident began when Plaintiff complained that his breakfast tray was dirty and had hair on it. Id., 41. Plaintiff returned the tray to Defendant McCord, who had delivered the meal, through the slot in his door. Id., 43. McCord took the tray and told Plaintiff that he

would speak to Defendant Ball, the supervising sergeant. Id. Ten or fifteen minutes later, McCord returned to distribute ice to the inmates. Id., 45. Plaintiff stuck his arm out of the door flap and asked McCord where his food was. Id. McCord directed Plaintiff to remove his arm from the door flap, but Plaintiff refused. Id., 46. When Plaintiff refused to comply, McCord went to get Sergeant Ball, who came to Plaintiff's cell with five or six other officers carrying shields and batons. Id., 48. Plaintiff, concerned that the officers would attempt to beat his arm, tied a blanket around the outer door knob and pulled it in through the flap, to keep the flap open without exposing his arm. Id. The officers removed the blanket and closed the flap. Id., 49. Plaintiff continued to complain about his breakfast tray. Id.

When Sergeant Ball failed to respond to Plaintiff's complaints, Plaintiff climbed on the toilet in his cell and removed the tab from a sprinkler head to activate the sprinkler system in his cell. Id. 49-50, 54-55. The sprinkler system began to flood the cell, and continued to run for between ten and thirty minutes before it was shut off. Id., 58. While the sprinkler was running, Plaintiff states that Sergeant Ball "came back down there and told me that I don't run his prison and other miscellaneous things and he was going to run in there and smash my face into the wall." Id. As the cell was filling up with water and Plaintiff was concerned that he might drown, Plaintiff asked Sergeant Ball to get him out of the cell. Id., 60. After the water was shut off, the officers left the area, leaving only Defendant Ketchup outside the cell to mop up the area. Id., 61, 64.

Approximately thirty minutes later, a team of officers in "C.E.R.T. team gear" arrived at Plaintiff's door. Id., 63. In front was Defendant Williams, followed by Billue, Ketchup, and Weems.[2] Id. Sergeant Ball was present to supervise, with two other officers, Defendants

---

[2] At some time prior to the arrival of the team, Officer Ketchup had left the area to obtain his gear and join the team. Pl.'s Dep. 64.

3

McCord and Hartsfield, operating cameras. Id., 64. Sergeant Ball knocked on Plaintiff's cell door, then radioed to direct the control room to open the cell door slightly. Id., 70. With the cell door slightly open, Sergeant Ball sprayed Plaintiff's cell with O.C.[3] spray, hitting Plaintiff in the face and arm. Id., 71. The door was then closed again.

Plaintiff stood by side of the door, waiting for the door to be reopened and the officers to come in. Id., 75. When the door was opened, Plaintiff attempted to charge out of the cell. He explains in his deposition testimony that he wanted to get in front of another inmate's door so that there would be a witness to any beating he received. Id. The officers pushed Plaintiff back into the cell and "piled onto" Plaintiff. Id., 76. Williams was directly on top of Plaintiff, who fell face down onto the floor. Id., 76-77. Plaintiff testifies that Williams struck him several times in the right eye with a closed fist. Id. 78-79. After Plaintiff attempted to move his head under Williams' shield to protect himself from further blows, Williams began to "hammer" the shield onto Plaintiff's face. Id., 86. While Williams was striking Plaintiff's face, Plaintiff testifies that Billue was "stomping" on Plaintiff's left arm (Id., 88) and Billue was "stomping or striking [Plaintiff's] legs with a fist and a foot." Id., 94.

When Plaintiff was finally handcuffed and shackled, he was lifted to his feet and escorted to the medical department. Weems held Plaintiff's left arm while Billue held Plaintiff's right arm. Id., 107. Plaintiff testifies that on the way to the medical department, Billue deliberately rammed Plaintiff's head into four different doors. Id., 108-09. Before striking Plaintiff's head into the doors, each time Billue said, "Quit resisting." Id., 112.

At the medical department, Plaintiff was examined by nurse Shombleekadekisha Goodrum. Goodrum has testified by affidavit that she "conducted a head-to-toe assessment" of Plaintiff and did not observe any bruising, swelling, or evidence of injuries. Goodrum Aff. ¶ 6.

---

[3] Oleoresin capsicum.

Goodrum has also testified that Plaintiff "did not voice any complaint of injury or pain during his medical examination." Id. ¶ 7. Plaintiff testifies that the nurse did nothing but check his blood pressure and temperature. Pl.'s Dep. 126. Plaintiff contends that as a result of the incident he suffered a bruised forehead and black eye that lasted approximately two weeks (Id., 80-81), a cut on his left forearm and "massive swelling" in his left elbow (Id., 88), and bruising and swelling of his left knee and thigh (Id., 98). After Plaintiff was seen by the nurse, he was escorted to a "strip cell," where his clothes were taken and he was given a paper gown to wear. Id., 131.

Plaintiff has presented evidence to show that Sergeant Ball was reprimanded following the cell extraction. On March 2, 2010, Captain Michael Moore, the Chief of Security for the Special Management Unit, issued a letter of reprimand finding that the force used was in violation of GDCP policies and procedures for use of force. Having reviewed the video footage, Moore observed that the officers used excessive force both in restraining Plaintiff and in leading Plaintiff to the medical unit:

> During the cell extraction video evidence clearly shows staff members using excessive and unnecessary force such as knee strikes and punches to the inmate's lower body without provocation or need. Once inmate Thomas was [restrained] and secure the video camera also caught officers going beyond the Use of Force Policy and [purposefully] started ramming inmate Thomas' head into each door they came in contact while escorting him to the medical section. During this incident at no time did you attempt or stop this excessive and unnecessary use of force on inmate Thomas.

Pl.'s Ex. B (Doc. 103-2). Moore concluded that Ball had failed to follow policy when he "did not attempt or stop the excessive and unnecessary use of force on inmate Thomas" and reminded Ball that as a supervisor Ball was "held responsible to ensure that staff members . . . follow all policies and procedures." Id.

### 2. The video

In support of their Motions for Summary Judgment, Defendants have submitted three compact discs containing video footage of the cell extraction. Doc. 77. The video evidence is largely consistent with Plaintiff's testimony. The first disc begins with Sergeant Ball assembling and introducing the extraction team, consisting of Officers Williams, Billue, Weems, and Ketchup. Ball notes that Officers McCord and Hartsfield are operating the video cameras. Based on Ball's gestures, the first disc appears to be the video taken by Hartsfield. The four members of the extraction team are wearing helmets and protective pads and are carrying plastic shields. The two camera operators and Sergeant Ball are not wearing any special gear.

The video shows the officers walking to Plaintiff's cell in the Special Management Unit. Hartsfield is positioned to the left side of the door (facing inwards). Ball speaks through the door and directs Plaintiff to "cuff up." After directing Plaintiff to cuff up three times, Ball asks, "Do you refuse to cuff up?" Plaintiff can be heard to reply, "Yep." After Plaintiff refuses, Ball directs the control room to open the door "one quarter." The four officers on the extraction team line up in front of the door in a single file. When the door opens, Ball sprays the O.C. agent into the cell at approximately eye level. The door is then closed again.

A few moments later, Ball directs the control room to open the cell door fully. When the door opens, Plaintiff can be seen crouched inside the cell. Plaintiff immediately attempts to rush out of the cell past the officers, but the officers push back and drive Plaintiff to the ground. The four officers pile on top of Plaintiff, and a scuffle ensues that lasts for approximately forty-five seconds. Due to the angle from which the footage is shot and the confined space, much of the action cannot be clearly observed.[4] The video does clearly show one officer, apparently officer

---

[4] A second video, shot by Officer McCord, was never produced. In response to numerous discovery requests and an order from the Court on Plaintiff's motion to compel, Defendants indicated that the disc produced by McCord was

6

Billue, driving his knee forcefully onto Plaintiff's leg at least twice. Plaintiff screams in pain each time. Billue also appears to punch Plaintiff several times. Another officer appears to punch Plaintiff at least twice on the opposite side of Plaintiff's body. One of the officers can be heard shouting, "Quit resisting."

After Plaintiff is subdued, the officers handcuff him and drag him out of the cell by his arms and legs. Plaintiff groans in pain as he is lifted to his feet and led down the hall. The left side of his face appears red and possibly swollen around the eye socket. He continues to gasp and groan as he is led down the hall. As he is led through the first door, Billue shoves Plaintiff's face into the door. At the second door, Plaintiff is obscured by the bodies of the officers. At the third door, Plaintiff's head cannot be seen, but on the audio track a clear thump can be heard as Plaintiff is pushed into the door, followed immediately by a scream and a groan. At the fourth door, another thump and groan can be heard. An officer says, "Stop resisting," and Plaintiff responds, "I'm not resisting."

Plaintiff is then led to a waiting room, where he is seated in a wheelchair. Plaintiff remains seated, surrounded by the officers, for approximately thirteen minutes. Initially, Plaintiff sits with his head hung and appears to be crying. When he lifts his head, a red mark is visible on the right side of his face next to the eye, and on the left side of his face there appears to be the beginning of a bruise below the eye. After thirteen minutes in the chair, Plaintiff is taken to a nearby sink and allowed to rinse his left arm.[5]

---

blank because McCord failed to "finalize" the recording prior to removing the disc from the camera. See Moore Aff. (Doc. 101-2). Although there appears to be no direct evidence of bad faith on the part of Defendants in the loss of McCord's footage, Plaintiff could be entitled to a spoliation instruction or an inference that the video would have contained evidence unfavorable to the Defendants. See Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997). McCord is visible in portions of Hartsfield's footage, and based on his position, it appears likely that McCord would have had a more direct view of the officers' actions during the struggle. For purposes of this Recommendation, it is presumed that McCord's video would have been consistent with Plaintiff's testimony.

[5] In his deposition, Plaintiff testified that he cut his left arm in the struggle. He asked to rinse the arm because the O.C. spray was in the wound and burning him.

After rinsing his arm, Plaintiff is led into the nurse's office. The nurse asks if Plaintiff has any injuries, but Plaintiff's mumbled response is unintelligible. Plaintiff is weighed. While Plaintiff is on the scale, a close-up view of the right side of his face clearly shows a large red welt beside his eye and a red lump just above his right eye. After Plaintiff is weighed, Ball instructs Hartsfield to turn the camera away so that the nurse can conduct her exam, and Hartsfield points the camera at the floor. The exam takes two minutes and thirty seconds, but cannot be seen on the video. When the camera is lifted, Plaintiff is seated on the exam table, still handcuffed, but with a blood pressure cuff on his right arm. The nurse asks, "What happened?" and Plaintiff responds, "Nothing." Nurse Goodrum's exam record notes that Plaintiff denied injury and that no injury was observed. Doc. 76-9. A checked box on the form indicates that Goodrum examined Plaintiff's head and neck and observed "no injury." The record notes that Plaintiff weighed in at 142 pounds.

### 3. The officers' testimony

Each of the defendant officers has submitted an affidavit in support of his motion for summary judgment. The officers generally deny Plaintiff's claims that he was kicked, punched, stomped on, or rammed into doors. Their evidence is summarized below.

#### a. Officer Billue

In his affidavit, Billue testifies that he did not attempt to cause Plaintiff any harm, but merely acted in a good faith attempt to gain control of a resisting Plaintiff. Billue denies punching or stomping on Plaintiff:

> Specifically, at no time during the cell extraction did I walk and stomp on Plaintiff's left arm. Further, at no time did I stomp, kick, hit or punch Plaintiff in the back of his legs, thighs, or calf area. Moreover, at no time did I stomp, kick, hit, or punch Plaintiff in any area of his body.

Billue Aff. ¶ 7 (Doc. 76-2).  Billue admits that he was the officer on Plaintiff's right arm as Plaintiff was escorted to the medical department, but denies that he intentionally struck Plaintiff's head against any doors:

> On the way to medical, we passed through at least four doors with glass windows.  At no time did I intentionally position any part of Plaintiff's head or body to ram Plaintiff into any door.  Any contact that Plaintiff's head or face may have made with any door was not the result of any intentional or purposeful action by me to cause Plaintiff harm.  At no time did I take any action to purposely ram Plaintiff into any door, and took no action during Plaintiff's transport to medical to cause him harm or injury.

Billue Aff. ¶ 10.

### b. Officer Williams

In his affidavit, Williams testifies that he was the first officer in line to enter Plaintiff's cell, and that he fell directly on top of Plaintiff, with his shield in between his body and Plaintiff's body.  He states that Plaintiff resisted being restrained and was "kicking and struggling."  Williams Aff. ¶ 6 (Doc. 76-6).  Williams further states that he "did not punch, kick, or in any way physically abuse Plaintiff."  Id.

### c. Officer Ketchup

Ketchup testifies in his affidavit that he "did not hit, punch, kick or stomp on any part of Plaintiff's head or body," and that he did not observe any other officers doing so.  Ketchup Aff. ¶ 6 (Doc. 76-4).  Ketchup confirms that Billue and Weems were the officers who led Plaintiff by arms to the medical unit, but denies that he saw either of them slam Plaintiff's head into the doors.  Id. ¶ 7.  He also denies seeing "any bruises, swelling or any other injury on Plaintiff's face or body at any time."  Id. ¶ 9.

### d. Officer Weems

Officer Weems offers minimal detail in his affidavit.  He simply states that he was a part of the extraction team, that Plaintiff resisted, was secured in handcuffs and leg irons, and was

transported to the medical unit for examination.  He does not state whether he was one of the officers who led Plaintiff by the arms to the medical unit.  He generally denies using or witnessing "any excessive force."  Weems Aff. ¶ 7 (Doc. 76-5).

### e.     Officer Hartsfield

Hartsfield states in his affidavit that his only role in the extraction was to videotape the proceedings.  He testifies that he "did not observe any GDC officers use what [he considered] to be unnecessary or excessive force."  Hartsfield Aff. ¶ 7 (Doc. 76-3).  He further states that he had no authority to direct any of the officers on the extraction team and no opportunity or authority to intervene to stop any use of force by the other officers.  Id.

### f.     Officer McCord

Officer McCord did not submit an affidavit in support of his Motion to Dismiss or the other Defendants' Motions for Summary Judgment.  He did, however, submit an affidavit in response to the Court's order on Plaintiff's Motion to Compel.  His affidavit offers no detail about the incident, but only affirms that McCord was present to videotape the extraction.

### g.     Sergeant Ball

In his affidavit, Sergeant Ball explains the procedures for a cell extraction and describes what he observed during the extraction of Plaintiff.  Ball explains:

> The procedure for extracting an inmate from his cell is to send the extraction team into the cell with the lead officer carrying a shield, and the other officers lined up behind the lead officer.  The lead officer is to use the shield and his body weight to push the inmate to the ground where the remaining officers attempt to secure the inmate's arms and legs and place them in restraints.

Ball Aff. ¶ 27 (Doc. 76-1).

Ball testifies that he was concerned that Plaintiff might have fashioned a weapon by sharpening a piece of metal from the damaged sprinkler head.  Id., ¶ 22.  Ball had known other

inmates to make such weapons and had heard "what sounded like metal being rubbed on a concrete floor coming from [Plaintiff's] cell" prior to the extraction. Id.

With reference to each officer on the extraction team, Ball denies witnessing any of the force described by Plaintiff.

Ball states that he did not see Officer Williams strike Plaintiff "in his face, forehead and right eye with a closed fist" and that he did not see Williams "hammer his shield into [Plaintiff's] face." Id., 30.

Ball states that he did not see Officer Billue "walk and stomp on [Plaintiff's] left arm with his boots or strike [Plaintiff's] left arm with a closed fist. Id., ¶ 30. Ball states that he did not see Ketchup "strike [Plaintiff's] thighs and calves with a closed fist or kick and stomp [Plaintiff's] legs with his boots. Id., 31.

Ball states that he "did not witness Officer Billue or any other officer ram [Plaintiff's] head into a door." Id., 38.

## SUMMARY JUDGMENT STANDARD

In accordance with Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Cleotex Corp. v. Catrett, 477 U.S.

317, 323 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the moving party is not entitled to judgment as a matter of law." Id. at 324-26. If the evidence presented by the non-movant is "not significantly probative" or is "merely colorable," then summary judgment must be granted. Anderson, 477 U.S. at 249. In fact, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

DISCUSSION

The evidence presented by the parties, viewed in the light most favorable to the Plaintiff, fails to establish that Officers Williams or Ketchup used excessive force in attempting to restrain Plaintiff during the cell extraction procedure. The undisputed evidence shows that Officers McCord and Hartsfield were present only to videotape the procedure and did not participate in any use of force or have any opportunity or authority to intervene to stop any use of force. As such, Williams, Ketchup, McCord, and Hartsfield are entitled to judgment as a matter of law.

There are genuine issues of material fact, however, regarding the conduct of Officers Weems and Billue and of Sergeant Ball. Plaintiff's testimony, corroborated by the videotape, indicates that either Billue, or Weems, or both intentionally rammed Plaintiff's head into four different doors, despite the fact that Plaintiff was already restrained and posed no further threat to the officers and was causing no further disruption. A reasonable jury could conclude, based on this evidence, that Billue, or Weems, or both used excessive force in violation of the Eighth Amendment. A reasonable jury could also conclude that Sergeant Ball was in a position to intervene to stop this use of force and failed to do so.

To establish a claim of excessive force under the Eighth Amendment, an inmate must present evidence to show that the force was applied "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). Courts evaluating claims of excessive force consider five factors "relevant to ascertaining whether force was used 'maliciously and sadistically for the very purpose of causing harm.'" Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475 U.S. at 321). These five factors are:

(1) the extent of the injury;

(2) the need for application of force;

(3) the relationship between that need and the amount of force used;

(4) any efforts made to temper the severity of a forceful response; and

(5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

Id.

Additionally, the use of force against an inmate while trying to secure the inmate or prevent harm to others "does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Campbell, 169 F.3d at 1374. Prison officers are given a wide range of deference acting to preserve discipline and security, and "guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007).

### 1.     Extracting Plaintiff from his cell

In the circumstances of this case, the evidence is insufficient to indicate that the defendant officers used unreasonable force in extracting Plaintiff from his cell and in restraining Plaintiff. Even if Plaintiff's testimony regarding the use of force is assumed to be true, the force was within the range of force that reasonable officers might have considered necessary to preserve discipline and security.

The undisputed evidence indicates that there was a clear need for the application of force. Plaintiff was isolated in the Special Management Unit because he had a history of disciplinary problems that included assaults on other inmates and at least one assault on a corrections officer. Plaintiff was incarcerated based on a conviction for riot in a penal institution, escape, and aggravated assault. Plaintiff had escalated the dispute over his breakfast tray, to the point of damaging property by activating his cell's sprinkler system. Because the sprinkler system had flooded the room, it was necessary to remove Plaintiff from the cell. Plaintiff was given several opportunities to submit voluntarily to restraints, but refused to do so. When the cell door was opened, Plaintiff attempted to charge out past the officers, bracing his hand against the door frame to provide leverage against them.

The use of force that took place in the initial extraction was proportional to the need for force. The officers approached Plaintiff in a single file, and the first officer in the file, Williams, fell on top of Plaintiff to pin him down while the other officers attempted to restrain his hands and feet. After Williams fell on top of Plaintiff, a struggle ensued for approximately forty-five seconds. Based on the video and Plaintiff's testimony, a reasonable jury could conclude that several punches were thrown during this struggle, possibly striking Plaintiff in the face, the side,

or the legs. The video also clearly shows Officer Billue driving his knee onto Plaintiff's leg several times.

Although some of these actions may seem in retrospect to have been more than was strictly necessary for four officers weighing more than two hundred pounds each to subdue a prisoner weighing 142 pounds, in the circumstances the defendants acted within the "wide range of deference" given to officers acting to preserve discipline and security in a penal institution. See Cockrell, 510 F.3d at 1311. The initial use of force took place in the context of a brief struggle with a prisoner who had been escalating the conflict for at least a half-hour and who was continuing to resist. Prior to beginning with the extraction procedure, Sergeant Ball made several attempts to avoid the use of force entirely by allowing Plaintiff to be removed voluntarily. The use of force resulted in minor injuries, at most some bruising or swelling and a minor cut. After struggling with the officers for forty-five seconds, Plaintiff was finally subdued, and the officers were able to restrain him with handcuffs and leg irons.

The findings of the internal investigation conducted by GDCP are not dispositive on summary judgment. In his letter of reprimand to Sergeant Ball, Captain Moore explained that the "knee strikes and punches to the inmate's lower body," shown in the video, were excessive and unnecessary, in violation of GDCP's use of force policy. Pl.'s Ex. B (Doc. 103-2). Captain Moore's finding that the force was "excessive and unnecessary" was based on the internal policies of GDCP, not on the Eighth Amendment, and "does not answer the question of whether [Defendants] maliciously and sadistically used force to cause [Plaintiff] harm." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009). Analysis of the five factors outlined in Cockrell, as set forth above, shows that there is insufficient evidence to support an Eighth Amendment claim of excessive force arising out of the initial cell extraction.

### 2.     Escorting Plaintiff to the medical unit

There is evidence in this case to show that either Billue, or Weems, or both intentionally rammed Plaintiff's head into four different doors after he was subdued, when no further use of force was warranted. A reasonable jury could conclude that these actions were sadistic and malicious and for the sole purpose of inflicting pain.

After being subdued by the extraction team, Plaintiff was hobbled by leg shackles and had his hands cuffed behind his back. On the video he appears to be out of breath and still somewhat dazed following the struggle with the officers. Two officers, Weems and Billue, are holding him by the arms and leading him down the hallways. Weems and Billue each appear to outweigh Plaintiff by nearly a hundred pounds. There is no indication that Plaintiff was offering any resistance. Nevertheless, the video indicates that Plaintiff's head was pushed against each of the four doors he was required to pass to reach the medical unit. On the first door, the contact does not appear to be significant, but on two of the doors, there is an audible thump and a grunt or yelp of pain from the Plaintiff.

The facts of this case are comparable to the facts in Skrtich v. Thornton, 280 F.3d 1295 (11th Cir. 2002), in which the defendant officers had continued to kick and punch an inmate who had been incapacitated by an electric shock in the course of a cell extraction. Because the inmate was no longer able to resist after the shock, the court found that no further force was necessary and that the subsequent kicks and punches were in violation of the Eighth Amendment. In this case, likewise, the evidence shows that Plaintiff was no longer able to resist once he was cuffed and shackled, and any force applied after that time would have been wanton and unnecessary.

Because there are genuine issues of material fact as to whether Plaintiff's head was rammed into the doors intentionally and for the purpose of causing pain, summary judgment is not appropriate as to Defendants Billue and Weems.

There are also genuine issues of material fact related to Plaintiff's claim that Sergeant Ball failed to intervene to protect Plaintiff from the actions of Billue and Weems. To establish liability for failure to protect, Plaintiff must show that the officers were "in a position to intervene yet failed to do so." Hadley v. Gutierrez, 526 F.3d 1324, 1331 (2008). In this case, a reasonable jury could draw the inference that Ball was in a position to intervene. He was the supervising officer in charge of the extraction procedure. He was following close behind when Billue and Weems escorted Plaintiff through the four doors on the way to the medical unit. He may not have been able to anticipate the first incident when Plaintiff's head was rammed against the door, but a jury might conclude that after the second incident he would have been aware that Billue and Weems were acting sadistically and maliciously. As the supervising officer, Ball could easily have stopped Billue and Weems from acting to harm Plaintiff.

The evidence is insufficient to support claims against the other defendants for failure to intervene. Because there was a supervising officer present who had the sole authority to direct the actions of the officers, the other officers were not in a position to intervene. Because Plaintiff has not demonstrated a genuine issue of material fact with regard to use of excessive force or failure to protect by defendants Williams, Ketchup, Carter, McCord, or Hartsfield, those Defendants are entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, it is hereby **RECOMMENDED** that the Motions for Summary Judgment of Defendants Williams, Ketchup, Carter, McCord, and Hartsfield be

**GRANTED**, and that the Motions for Summary Judgment of Defendants Ball, Billue, and Weems be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom the case is assigned **WITHIN (14) DAYS** after being served with a copy thereof.

**SO RECOMMENDED**, this 31st day of July, 2012.

                                        s/ Charles H. Weigle_____
                                        Charles H. Weigle
                                        United States Magistrate Judge